**Reversed and Remanded and Opinion filed August 28, 2014.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-13-00375-CR

_____

**KEVIN LAVELLE KENT, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 174th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1253665**

## O P I N I O N

In an issue of first impression, we must decide whether statutory violations aggregated for purposes of Section 31.09 of the Penal Code, the aggregate theft statute, are elements that the jury must unanimously agree upon, or whether the violations are mere manner and means for which no unanimity is required.[1]

---

[1] *See* Tex. Penal Code Ann. § 31.09 ("When amounts are obtained in violation of this chapter pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense.").

Determining what elements of a statute require unanimity is a matter of legislative intent. In construing the aggregate theft statute, we conclude that unanimity is required for the gravamina of the underlying statutory violations that are aggregated for purposes of the offense of aggregate theft.

Because the jury charge did not require this unanimity and appellant suffered some harm, we reverse and remand for a new trial.

## I.    BACKGROUND

Appellant was charged by complaint with theft of money in the aggregate of over $200,000 from Barbara Allen, Tamara Allen, Larry Aniol, and Joann Aniol during a period of five years. The State presented evidence that the Aniols, husband and wife, wished to sell their commercial property, River Gardens, to Barbara Allen for $19.5 million. Tamara Allen was Barbara's daughter and business partner. An intermediary put the Aniols and Barbara in touch with appellant and his d/b/a, Orlando Mortgage Company, so appellant could serve as a mortgage broker for Barbara and secure financing for the transaction. The State presented evidence that appellant convinced the Aniols and Barbara to transfer money to him by his use of various deceptions, including lies about his ability to secure financing, the involvement of his father, statements on his website about his past deals, and a purported $50 million line of credit issued to Orlando Mortgage. Ultimately, the State adduced evidence that the Aniols and Barbara transferred over $1.4 million to appellant. The Aniols and Barbara believed their money was being held in escrow, but when the sale never closed, appellant did not return the money to them.

Joann and Barbara testified about the various transfers made to appellant on the River Gardens transaction. Barbara started speaking with appellant in February 2003. He said he would be able to provide 100 percent financing for Barbara to

2

purchase River Gardens. Appellant told Barbara she could "buy down" the interest rate from 7.5 percent to 4.95 percent if she gave him $200,000. Appellant asked Joann to help Barbara buy down the interest rate. The Aniols agreed to help, so Barbara and the Aniols signed a "short term loan" agreement for $200,000. The Aniols gave Barbara $200,000 with the understanding that the money would go into escrow and the Aniols would be repaid at closing. Barbara then transferred the $200,000 to appellant in May 2003.

Appellant called Barbara again and offered a buy down on the interest rate to 3.95 percent for an additional $100,000. Barbara gave appellant $100,000 in June 2003. In October 2003, appellant asked for a $300,000 "good faith deposit" from the Aniols. Appellant and the Aniols signed a document memorializing that the $300,000 was a "good faith assurance on [the Aniols'] part to [appellant's] father, who is making available a reserve account to Barbara Allen for 18 months of debt service."[2] The document indicated that the money would be placed in escrow, and "[u]nder any and all circumstances, the $300,000 will be returned to [the Aniols] in its entirety." The Aniols sent appellant another $150,000 in February 2004, which according to Joann "was to be used as part of the points down, helping with the points." She understood it was going into an escrow account and would be returned to the Aniols at the time of closing.

In August 2004, appellant signed and faxed to the Aniols an escrow agreement acknowledging the Aniols' deposit of $450,000 to date "in a non-interest bearing account to escrow." The agreement states that if "the sale does not or will not otherwise occur, the $450,000.00 paid by Seller into escrow will automatically be paid and returned to Seller in immediately available funds."

---

[2] Barbara explained that debt service is the ability to "meet the note over your income. . . . To run your property."

3

In December 2004, appellant requested another $125,000 from Barbara, and again the Aniols loaned Barbara the money with the understanding the money would be put into an escrow account and they would be paid back at closing. Barbara gave the money to appellant with the understanding it was going into escrow. Joann thought this money was needed because of a difference in appraisal values of her property, but Barbara testified this money was to provide "good faith" for the "people at the bank who controlled all the loans."

In May 2005, appellant asked the Aniols to "put up" an additional $200,000 for "debt service." The Aniols sent the money with the understanding the money would go into an escrow account and be returned at the time of closing. Ultimately, appellant asked the Aniols for an additional $250,000 in November 2005. But Joann was "so disgusted I just wanted to scream," and she and her husband told appellant the sale was not going through and that they wanted their money back. The Aniols sent appellant a demand letter in December 2005 for return of their $775,000, and they sent Barbara a demand letter for return of the initial $200,000 loan. Joann testified that she prepared a document, State's Exhibit 65, which identifies the five separate transfers the Aniols made to appellant (directly and through Barbara) over the course of about two years. The total amount the Aniols transferred to appellant was $975,000, including the $200,000 and $125,000 loans to Barbara in May 2003 and December 2004, respectively. Joann testified that appellant never returned any of the money, despite the lack of a closing for River Gardens.

When the Aniols called off the River Gardens deal, appellant told Barbara that he had returned the Aniols' money. He also offered to provide Barbara a $25 million line of credit toward the purchase of a hotel. However, to keep the line of credit open, appellant said that the bank wanted "good faith debt service" money.

4

So Barbara transferred an additional $337,000 to appellant over the next several years with the understanding the money was going into escrow, as follows:

- March 17, 2006      $74,000
- September 8, 2006      $10,000
- August 20, 2006      $50,000
- November 30, 2006      $50,000
- April 30, 2007      $15,000
- May 30, 2007      $15,000
- July 26, 2007      $30,000
- September 28, 2007      $13,000
- December 3, 2007      $40,000
- January 11, 2008      $10,000
- February 28, 2008      $5,000
- March 13, 2008      $25,000

Barbara testified that although some payments may have been made by Tamara, it was like Barbara sending the money because they were partners; and if Barbara sent money, it was like Tamara sending the money.

Barbara attempted to secure financing for "maybe under 10" hotels, but every time she and the hotels' owners complied with appellant's requests, "there would be a problem that he could not complete it." Ultimately, when the last hotel owner decided to pull out of the deal due to appellant's labor-intensive demands and prolonged closings, Barbara demanded return of her money from appellant. He did not return any of her money.

Appellant testified that the various amounts transferred to him by the Aniols and the Allens were fees for services rendered—he considered all the payments to be "[g]ood faith deposits for others putting cash up on their behalf." He claimed

5

that he and other partners were contributing funds to a lender on behalf of the Aniols and Barbara. He also contended that he was a party to a general release from liability for the River Gardens transaction and thus owed nothing for that transaction.

Joann acknowledged that she had "constant phone calls" with appellant during the years that she was trying to sell River Gardens to Barbara. She had "practically daily conversations" with appellant, and the Aniols would send documents to appellant "[d]aily, hourly practically sometimes." The Aniols sent appellant thousands of documents, and they received 900 faxes from appellant. Joann acknowledged that the documents the Aniols sent to appellant were typical for underwriting. She also testified that she did not know exactly how appellant was going to be paid in the transaction, and she had lawyers reviewing the transaction beginning in the fall of 2004.

> The trial court charged the jury with the following application paragraph:

> Now, if you find from the evidence beyond a reasonable doubt that in Harris County, Texas, the defendant, Kevin Lavelle Kent, heretofore on or about May 15, 2003 and continuing through March 13, 2008, did then and there unlawfully, pursuant to one scheme or continuing course of conduct, appropriate, by acquiring or otherwise exercise [sic] control over property, namely, money, owned by Barbara Allen or Tamara Allen or Larry Aniol or Joann Aniol, with the intent to deprive Barbara Allen or Tamara Allen or Larry Aniol or Joann Aniol of the property and the total value of the property appropriated was over two hundred thousand dollars, then you will find the defendant guilty of theft of property of the total value of over two hundred thousand dollars, as charged in the indictment.

Appellant objected to the jury charge because it did not require the jury to agree unanimously that the State proved beyond a reasonable doubt each element of the offense, arguing that the Court of Criminal Appeals "considers each theft an

6

element of the offense in an aggregated case." Appellant asked that each underlying theft be listed by date, amount of money, and the owners.[3] The trial court overruled appellant's objection.

The jury found appellant guilty, and the trial court assessed punishment at sixty years' confinement. The court also ordered appellant to pay restitution in the amounts of $975,000 to Larry and Joann Aniol and $437,000 to Barbara and Tamara Allen.

## II. ERROR IN THE CHARGE

In his sole issue on appeal, appellant contends the trial court, over his objection, submitted an erroneous jury charge with a disjunctive application paragraph that allowed for a non-unanimous verdict. The State suggests that the Court of Criminal Appeals has issued "contrary" opinions with "loose language," but the Court has not expressly ruled on the issue. The State also points to a decision from this court suggesting unanimity is not required for aggregate theft.

We first review general principles regarding jury unanimity and theft. Then, we look to the legislative intent of the aggregate theft statute and hold that jury unanimity is required for the gravamina of the underlying statutory violations. We also conclude that this court's suggestion to the contrary in a securities fraud case was non-binding dicta.

## A. General Principles Regarding Jury Unanimity and Theft

The Texas Constitution and Code of Criminal Procedure require Texas juries to reach a unanimous verdict in all felony prosecutions. *Landrian v. State*, 268

---

[3] *See* Comm. on Pattern Jury Charges–Criminal, State Bar of Tex., *Texas Criminal Pattern Jury Charges: Property Crimes* § D5.7 (2012) (listing each underlying theft offense in an aggregate theft application paragraph with the date of appropriation, description of the property, name of the owner, and value of the property; but not requiring unanimity as to each underlying theft).

7

S.W.3d 532, 535 (Tex. Crim. App. 2008); *see also* Tex. Const. art. V, § 13; Tex. Code Crim. Proc. Ann. art. 36.29. "Unanimity in this context means that each and every juror agrees that the defendant committed the same, single, specific criminal act." *Ngo v. State*, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005). The unanimity requirement "ensures that the jury agrees on the factual elements underlying an offense—it is more than mere agreement on a violation of a statute." *Francis v. State*, 36 S.W.3d 121, 125 (Tex. Crim. App. 2000). "The unanimity requirement is undercut when a jury risks convicting the defendant on different acts, instead of agreeing on the same act for a conviction." *Id.*

But not all "acts" require unanimity. The jurors "must unanimously agree on each 'element' of the crime in order to convict, but need not agree on all the 'underlying brute facts [that] make up a particular element.'" *Ngo*, 175 S.W.3d at 746 (quoting *Richardson v. United States*, 526 U.S. 813, 817 (1999)). Unanimity is required for "a fact that is a specific *actus reus* element of the crime," but unanimity is not required for a fact "that is 'but the means' to the commission of a specific actus reus element." *See id.* In other words, "unanimity is required on the essential elements of the offense but is generally not required on the alternate modes or means of commission." *Pizzo v. State*, 235 S.W.3d 711, 714 (Tex. Crim. App. 2007) (quotation omitted).

"In deciding what elements and facts a jury must unanimously agree on, courts implement the legislative intent behind the penal provision." *Landrian*, 268 S.W.3d at 536. By examining the "statutory language for legislative intent, we inquire into the 'gravamen' of the offense." *Jourdan v. State*, 428 S.W.3d 86, 95–96 (Tex. Crim. App. 2014). One method or "general rule of thumb for making this determination of legislative intent" is the "eighth-grade grammar" test. *Stuhler v. State*, 218 S.W.3d 706, 718 (Tex. Crim. App. 2007); *see also Jourdan*, 428 S.W.3d

at 96.  Under this test, we diagram the statutory text according to the rules of grammar:

> The essential elements of an offense are, at a minimum: (1) the subject (the defendant); (2) the main verb; (3) the direct object if the main verb requires a direct object (i.e., the offense is a result-oriented crime); [(4)] the specific occasion; and [(5)] the requisite mental state.

*Pizzo*, 235 S.W.3d at 714–15 (quotation omitted).  Generally, adverbial phrases are not "elemental" for jury unanimity purposes.  *Jourdan*, 428 S.W.3d at 96.  However, an adverbial phrase may "provide a level of specificity that arguably serves to define discretely actionable units of prosecution even within the same statutory subsection."  *Id.*

One situation giving rise to a jury unanimity problem, as relevant here, is when the State puts on evidence of the "repetition of the same criminal act, but with different results."  *Ngo*, 175 S.W.3d at 747; *accord Cosio v. State*, 353 S.W.3d 766, 771–72 (Tex. Crim. App. 2011).  "For example, the State might charge a defendant with stealing a credit card from Hong Truong and put on evidence that he stole a credit card from Hong Truong and Hanh Nguyen."  *Ngo*, 175 S.W.3d at 747 n.33.  Or as another example, "if the State charges the defendant with the theft of one item and the evidence shows that the defendant had in fact stolen two of the same items, the jury's verdict may not be unanimous as to which of the two items the defendant stole."  *Cosio*, 353 S.W.3d at 772.

The examples from *Ngo* and *Cosio* necessarily acknowledge that "[t]heft has two gravamina: the property and ownership."  *Johnson v. State*, 364 S.W.3d 292, 297 (Tex. Crim. App. 2012).[4]  Accordingly, "the allowable unit of prosecution can

---

[4] Although *Johnson* addressed the legal sufficiency of the evidence in light of a non-statutory variance between the indictment and the proof at trial, the court reasoned that "[t]he jury unanimity context may provide a useful framework for evaluating non-statutory variances

9

at least be derived from the combination of these elements: different property taken from different persons are different thefts." *Id.* "Of course multiple thefts could be committed against the same person, e.g. different property stolen on different days." *Id.* at 297 n.33. Regarding ownership in particular, "[t]he specific name of the owner is not an element of the offense of theft, but it is a non-statutory description of the statutory, gravamen element of ownership." *Id.* at 297; *see also Garza v. State*, 344 S.W.3d 409, 414 (Tex. Crim. App. 2011) (in an aggregate theft prosecution, although "the name of the owner is not a substantive element of theft, the state is required to prove, beyond a reasonable doubt, that the person alleged in the indictment as the owner is the same person shown by the evidence presented at trial to be the owner").

Accordingly, the description of the property and name of the owner are facts that represent the specific actus reus of the elements of theft—these are elemental facts for which jury unanimity is required. *See Johnson*, 364 S.W.3d at 297. We must now determine whether a similar level of unanimity is required under the *aggregate* theft statute: must jurors agree unanimously about what specific property was appropriated from specific owners? We hold that such unanimity is required.

**B.   Unanimity Required for Underlying Statutory Violations of Aggregate Theft**

Aggregate theft under Section 31.09 "consists of two or more incidents of theft, [but] the statute makes them one offense." *Graves v. State*, 795 S.W.2d 185, 187 (Tex. Crim. App. 1990). "Each individual theft and its elements aggregated under Section 31.09 is an element of the single offense created by Section 31.09."

---

because any issue involving a non-statutory variance can be converted into a jury unanimity question." 364 S.W.3d at 296.

*State v. Weaver*, 982 S.W.2d 892, 893 (Tex. Crim. App. 1998); *accord Garza*, 344 S.W.3d at 414; *see also Dickens v. State*, 981 S.W.2d 186, 188 (Tex. Crim. App. 1998) ("Aggravated theft is the sum of all its parts. A part is a completed theft whose elements have all been proven.").

Although the Court of Criminal Appeals has held that each underlying theft and its elements are elements of aggregated theft, the court has never squarely addressed the issue of whether each underlying theft is an "element" for purposes of jury unanimity. *See Weaver*, 982 S.W.2d at 893 (holding that venue is proper in any county in which any element of any of the underlying thefts occurred); *Dickens*, 981 S.W.2d at 188 (holding that the pre-amendment punishment for theft applied because the savings clause in the amended statute stated that an offense was "committed before the effective date of the statute if any element of the offense occurs before the effective date"; at least one underlying theft in this aggregate theft case occurred before the effective date, and "each subsidiary offense is a component of that one offense of aggregated theft"); *see also Anderson v. State*, 322 S.W.3d 401, 408 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (statute of limitations for aggregate theft begins to run when all the elements of the last underlying theft have occurred because (1) each underlying theft and its elements is an element of aggregate theft, (2) the limitations period begins to run when the last theft is completed, and (3) a theft is completed when all the elements have occurred). *See generally* Comm. on Pattern Jury Charges–Criminal, State Bar of Tex., *Texas Criminal Pattern Jury Charges: Property Crimes* § D5.7, cmt. at 138–39 (2012) (noting that "Texas case law is not clear" on the issue of whether the jury must unanimously agree that the state proved each underlying theft, and the Committee was split on the issue with a majority predicting that courts would not require unanimity).

11

Accordingly, we now turn to the eighth-grade grammar test to determine legislative intent. The difficulty of applying the test, however, is apparent from the text of the statute, which is not worded like the vast majority of penal statutes.[5] The statute provides: "When amounts are obtained in violation of this chapter pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense." Tex. Penal Code Ann. § 31.09. Notably, the statute omits the subject of all penal statutes (i.e., the defendant) and contains no mental state. Rather, the statute begins with the subordinating conjunction "when," which connects a dependent clause[6] and independent clause.[7] The dependent clause contains a subject "amounts" with the passive verb "are obtained," followed by an adverbial phrase "in violation of this chapter" and another adverbial phrase "pursuant to one scheme or continuing course of conduct." The dependent clause and independent clause are interrupted by a conjunctive adverbial phrase "whether from the same or several sources." The independent clause does not appear to include elements of the aggregate theft offense but merely describes the result of proving the offense—the jury, court, State, or some other actor may "consider" the conduct as one offense and "aggregate" the amounts to determine the grade.

Considerable linguistic acrobatics are required to fit this statute within the confines of the eighth-grade grammar test. If we add the subject of all penal statutes (i.e., the defendant), rephrase the statute in the active voice, and eliminate

---

[5] Most statutes begin with the phrase "a person commits an offense if," and include an active verb, a direct object, and a mental state.

[6] "When amounts are obtained in violation of this chapter pursuant to one scheme or continuing course of conduct . . . ."

[7] ". . . the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense."

12

the independent clause that does not serve to define elements of the offense, then the statute appears as follows: "A person commits an offense if he obtains amounts in violation of this chapter pursuant to one scheme or continuing course of conduct, whether from the same or several sources." But this rewriting does not fully address the elements that the State must prove—namely, "violations of this chapter." Indeed, the indictment and jury charge in this case did not track the language of the aggregate theft statute. The State did not allege that appellant obtained amounts "in violation of this chapter." Rather, the State alleged (and the jury was charged) that appellant unlawfully appropriated property from its owners with the intent to deprive the owners of the property, thus supplanting the language of Section 31.09 with the general theft language in Section 31.03: "A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property." Tex. Penal Code Ann. § 31.03. In other words, to determine what must be proven in an aggregate theft case, we must look outside Section 31.09 to the elements of the underlying theft statute found in Section 31.03.

Therefore, although "in violation of this chapter" is an adverbial phrase, it appears to "provide a level of specificity that arguably serves to define discretely actionable units of prosecution." *Jourdan*, 428 S.W.3d at 96. Chapter 31 of the Penal Code contains at least eleven different offenses,[8] three of which assign punishment classifications based on the value of what was stolen.[9] Because we must look to other sections of Chapter 31 to construct an offense under Section 31.09, it is likely the Legislature intended to incorporate the the gravamina of the

---

[8] *See* Tex. Penal Code Ann. §§ 31.03, 31.04, 31.05, 31.07, 31.11, 31.12, 31.13, 31.14, 31.15, 31.16, 31.17.

[9] *See* Tex. Penal Code Ann. §§ 31.03 (theft), 31.04 (theft of services), 31.16 (organized retail theft).

underlying statutory violations for purposes of unanimity. As discussed above, those gravamina for Section 31.03 are the property and owners: "different property taken from different persons are different thefts." *Johnson*, 364 S.W.3d at 297.

Turning to the specific words used in Section 31.09, the Legislature's use of the phrase "in violation of this chapter" suggests that unanimity is required for each underlying theft. In *Richardson v. United States*, the United States Supreme Court had to determine whether a jury needed to unanimously agree about the underlying violations committed by a defendant to support a conviction under the continuing criminal enterprise statute. *See* 526 U.S. at 815.[10] The statute provides that a person commits an offense if he, among other things, "violates any provision of this subchapter or subchapter II of this chapter" (i.e., federal drug laws), and "such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter." *See* 21 U.S.C. § 848(c), *quoted in Richardson*, 526 U.S. at 815. The defendant urged, and the Court agreed, that a jury must unanimously agree upon each "violation" that constitutes the series of violations. 526 U.S. at 824.

The *Richardson* Court, like courts in Texas, began with the statutory text to determine legislative intent. *See id.* at 818. The Court reasoned that the word "violations" has a "legal ring," and a "'violation' is not simply an act or conduct; it is an act or conduct that is contrary to law." *Id.* The Court found the use of the

---

[10] *Richardson* is persuasive because unanimity is required in federal criminal cases, and federal courts follow a similar legislative-intent approach for determining what elements of a statute require unanimity. *See Jefferson v. State*, 189 S.W.3d 305, 311 n.7 (Tex. Crim. App. 2006) (citing *Richardson* for the proposition that "courts must examine language of statute to determine whether particular term in statute is an element, which requires juror unanimity, or an underlying brute fact or means of committing an element which does not require juror unanimity"); *Ngo*, 175 S.W.3d at 746–47 ("*Richardson* is precisely analogous to the present case."); *see also Francis*, 36 S.W.3d at 125 n.1 (federal opinions on unanimity are "helpful in illustrating the error").

14

word "violation" significant because "the criminal law ordinarily entrusts a jury with determining whether alleged conduct 'violates' the law," and a "federal criminal jury must act unanimously when doing so." *Id.* The Court's holding that each "violation" amounted to a separate element was "consistent with the tradition of requiring juror unanimity where the issue is whether a defendant has engaged in conduct that violates the law." *Id.* at 818–19.

The Court also reasoned that the criminal enterprise statute acted as a pseudo-enhancement statute. *See id.* at 822 (noting that the statute originally began as an recidivist provision that provided for enhanced sentences). This aspect of the statute further suggested that unanimity was required because for a prior conviction to be used for enhancement, an earlier factfinder—"a unanimous federal jury in the case of a federal crime"—must have "found that the defendant committed the specific earlier crime." *Id.* Not requiring unanimity for this type of statute would, "in effect, impose punishment on a defendant for the underlying crimes without any factfinder [i.e., unanimous jury] having found that the defendant committed those crimes." *Id.*

Similar to the continuing criminal enterprise statute, the primary purpose of the aggregate theft statute is to impose a greater punishment on persons who have committed multiple thefts pursuant to one scheme or continuing course of conduct, allowing the state to aggregate those thefts for determining the grade of the offense. *See* Tex. Penal Code Ann. § 31.09; *see also Weaver*, 982 S.W.2d at 894–95 (noting that the "main purpose" of the 1974 addition of Section 31.09 was to "increase the punishment range for a thief who commits various thefts" because under the common law, a person who "stole *x* amount from various victims at different times could not be as severely punished as a thief who stole the same amount from one victim at one time even though the Legislature considered these

15

two thieves to be equally culpable"). The aggregate theft statute, therefore, acts as a pseudo-enhancement statute. Not requiring unanimity as to the underlying thefts would impose punishment on a defendant for the underlying thefts without a unanimous jury having found beyond a reasonable doubt that the defendant committed those thefts. *See Richardson*, 526 U.S. at 822. Accordingly, "*Richardson* is precisely analogous to the present case." *Ngo*, 175 S.W.3d at 747.

The State does not contend that the Legislature intended Section 31.09 to do away with the practice of requiring unanimity for the two gravamina of theft. After noting Section 31.09's departure from the common law and the purpose of increasing punishments, this court quoted from the practice commentary that "'the prosecution will have to allege and *prove each separate 'offense,'* but the value of several items can now be combined for jurisdictional and punishment purposes.'" *State v. Graves*, 775 S.W.2d 32, 33 (Tex. App.—Houston [14th Dist.] 1989) (emphasis added) (quoting Searcy III and Patterson, *Practice Commentary*, Tex. Penal Code Ann. § 31.09 (Vernon 1989)), *aff'd* 795 S.W.2d 185. *But see Kellar v. State*, 108 S.W.3d 311, 313–14 (Tex. Crim. App. 2003) (indictment need not allege the underlying thefts when the defendant's constitutional right to sufficient notice is otherwise satisfied through "actual notice of the specific instances of theft upon which the State [is] basing its allegations" of aggregate theft). Further, the aggregate theft statute's departure from the common law undermines any suggestion that there is a "history or tradition of treating individual criminal 'violations' as simply means toward the commission of a greater crime." *See Richardson*, 526 U.S. at 821.

Finally, we note that the Legislature is well aware of how to except certain elements of penal statutes from the unanimity requirement when the elements require proof that a defendant committed multiple underlying criminal offenses.

16

*See* Tex. Penal Code Ann. § 21.02 ("Continuous Sexual Abuse of Young Child or Children" offense requires proof that the defendant "commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims"; defining "act of sexual abuse" as "a violation of one or more" of eight different penal laws; providing that "members of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed"); Tex. Penal Code Ann. § 25.11 ("Continuous Violence Against the Family" offense requires proof that the defendant "two or more times engages in conduct that constitutes an offense under Section 22.01(a)(1) [i.e., assault] against another person or persons whose relationship to or association with the defendant is described by" various sections of the Family Code; providing that "members of the jury are not required to agree unanimously on the specific conduct in which the defendant engaged that constituted an offense under Section 22.01(a)(1)"). The Legislature's failure to expressly except the statutory violations underlying Section 31.09 from the unanimity requirement of the Texas Constitution indicates that the Legislature intended to retain unanimity for the gravamina of the underlying theft offenses. *Cf. Ojo v. Farmers Group, Inc.*, 356 S.W.3d 421, 427 (Tex. 2011) (Legislature's providing expressly for a particular claim in one statute but not another suggests that the Legislature did not intend to provide for that claim in the latter statute; the Legislature was "well aware" of how to create such a claim).

In light of the plain text of the statute and the purpose for which it was enacted, and consistent with the Court of Criminal Appeals' treatment of each of the underlying thefts as an "element" of aggregate theft, we conclude that the Legislature intended for jurors to unanimously agree beyond a reasonable doubt that a defendant committed the underlying statutory violations comprising a Section 31.09 offense. Accordingly, when an aggregate theft offense is predicated

17

on Section 31.03, the jury must unanimously agree about what property was unlawfully appropriated and who owned it.

## C. *Lehman* and *Murchison* Do Not Require a Different Result

The State contends that the underlying statutory violations comprising a Section 31.09 offense are not "elements" for which unanimity is required, but mere "manner and means of committing the charged offense." The State relies on, *Lehman v. State*, 792 S.W.2d 82 (Tex. Crim. App. 1990), and *Murchison v. State*, 93 S.W.3d 239 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd). We address each case in turn.

In *Lehman*, the defendant was indicted for aggregate theft, and the indictment identified each of the six underlying thefts. 792 S.W.2d at 83. The defendant argued that the jury charge erroneously "authorized the jury to convict if it believed appellant had committed some, but not all, of the acts of theft alleged in the indictment." *Id.*[11] Essentially, the defendant contended that if he is "charged with stealing 'widgets A, B, and C,' he must be convicted of stealing 'widgets A, B, and C,' and not for the 'different' offense of stealing widgets A and B." *Id.* at 84. The court rejected that argument and agreed with the State that "if a defendant is charged with stealing 'A, B, and C, widgets of an aggregate value greater than $750.00 but less than $20,000.00,' the State need only prove that defendant stole widgets worth between $750.000 and $20,000.00 from among widgets A, B, and

---

[11] The trial court instructed the jury that it could convict the defendant if it believed

> beyond a reasonable doubt that the Defendant committed one or more of these thefts, if any, from the above named individuals, pursuant to one scheme and continuing course of conduct, so long as the value of the money stolen, if any were, was more than Seven Hundred Fifty Dollars and less than Twenty Thousand Dollars.

*Lehman v. State*, 727 S.W.2d 656, 658 (Tex. App.—Houston [1st Dist.] 1987), *aff'd* 792 S.W.2d 82.

18

C." *Id.* The court noted that the State may plead "alternative 'manner and means' in the conjunctive when proof of any one 'manner or means' will support a guilty verdict," and the court concluded, "Likewise, the State should be allowed to plead all property which the evidence may ultimately prove stolen without thereby being required to prove theft of any larger quantum of property than the statute at issue required." *Id.* at 84–85. In other words, pleading "extra" thefts does not require a defendant's acquittal when the State fails to prove one of those thefts that is not essential to satisfying the value threshold of the grade of the offense alleged. *See id.* at 84 ("[T]here is no reason that he should be acquitted if the evidence shows him guilty of stealing enough of the 'bundle' to make him guilty of the offense charged.").

*Lehman* addressed the narrow question of whether the State must prove all underlying thefts alleged in the indictment. It did not address whether, as relevant here, the jurors would have to unanimously agree that the defendant stole "widgets A and B" or "widgets B and C" even if all the jurors ultimately concluded that the defendant stole widgets with sufficient value to convict the defendant of the grade of the offense alleged. And *Lehman* did not address whether the jurors would have to unanimously agree from whom the defendant stole property. "*Lehman* did not clearly address unanimity." Comm. on Pattern Jury Charges–Criminal, State Bar of Tex., *supra*, § D5.7, cmt. at 139.

However, this court in *Murchison* read *Lehman* as addressing unanimity. *See Murchison*, 93 S.W.3d at 260. In *Murchison*, the defendants were charged with aggregate securities fraud under Tex. Rev. Civ. Stat. Ann. art. 581–29–2, a statute that is nearly identical to the aggregate theft statute. *See Murchison*, 93 S.W.3d at 258. The defendants were indicted for "intentionally fail[ing] to disclose at least one of the five Material Facts listed in the jury charge." *Id.* at 257.

19

The underlying offense of securities fraud required proof that the defendants engaged in fraud or a fraudulent practice by intentionally failing to disclose a material fact. *See* Tex. Rev. Civ. Stat. Ann. art. 581–4(F), 581–29(C)(1); *Murchison*, 93 S.W.3d at 258. This court held that the "Material Facts" listed in the jury charge, which involved various omissions relating to the sale of debentures, were "alternative manner and means of committing the same offense." *Murchison*, 93 S.W.3d at 258–59. Then, as "further support for our disposition," this court analogized to the aggregate theft statute in *Lehman*. *See id.* at 259–60. The *Murchison* court reasoned, "If the jury need not unanimously agree as to which of these six thefts were committed by an aggregate-theft defendant, then there is no reason why the jury should be required to unanimously agree as to which of the Material Facts the appellants intentionally failed to disclose." *Id.* at 260.

However, the Material Facts identified in the jury charge in *Murchison* were clearly manner and means of an offense such that they were the "underlying brute facts" that satisfied the element of fraud. As in *Murchison*, we do not hold that the jury was required to agree unanimously about *how* appellant unlawfully appropriated money from its owners. When the State does not unnecessarily plead a manner and means—such as theft "by deception"—then the jury is not required to find that the defendant engaged in that specific manner and means. *See Geick v. State*, 349 S.W.3d 542, 546–47 (Tex. Crim. App. 2011) (holding that the State was bound to prove theft by deception, rather than theft alone, when it alleged the more narrow offense by choosing to specifically plead one of five possible circumstances that make consent ineffective).

Here, the State did not allege manner and means for the various underlying thefts, and so the State was not limited to any particular manner and means. *See id.*

This case would be analogous to *Murchison* if, for example, appellant contended that the jury needed to unanimously agree upon whether appellant unlawfully appropriated money through deception because of his creating or confirming a false impression about his ability to secure financing, his father's involvement with a lending institution, or the past deals he had completed and listed on Orlando Mortgage's website. Those are the types of "brute facts" for which the *Murchison* appellants contended required jury unanimity. *See Murchison*, 93 S.W.3d at 248–49 (describing the detailed factual allegations included in the jury charge as the "material facts" that the defendants intentionally failed to disclose). However, we hold that the jury must unanimously agree about the gravamina of theft: what was stolen and from whom was it stolen. We do not hold that the jury must unanimously agree about the brute facts comprising the *method* of unlawful appropriation.

*Murchison*'s suggestion that *Lehman* addressed the issue of jury unanimity was dictum because it was not necessary to the ultimate disposition. *See State v. Brabson*, 966 S.W.2d 493, 498 (Tex. Crim. App. 1998) (describing dicta as being "unnecessary to our ultimate disposition" of the case); *Edwards v. Kaye*, 9 S.W.3d 310, 314 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (same). *Murchison*'s statement about *Lehman*, provided in "further support" of the court's disposition, was not "made very deliberately after mature consideration and for future guidance in the conduct of litigation," and thus is not judicial dictum that need be followed. *See Edwards*, 9 S.W.3d at 314.

Because the jury charge in this case did not instruct the jurors that they needed to unanimously agree about what property was stolen from which owners, and all of the potential owners of the property were listed in the disjunctive, the charge was erroneous. We now address whether appellant suffered some harm.

21

# III.   SOME HARM

The State agrees with appellant that he preserved error by objecting to the charge. When error in the jury charge is preserved, as here, reversal is required if the error is "'calculated to injure the rights of the defendant,' which means no more than that there must be *some* harm to the accused from the error." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (quoting Tex. Code Crim. Proc. Ann. art. 36.19). Reversal is required if we find "some actual, rather than merely theoretical, harm from the error." *Dickey v. State*, 22 S.W.3d 490, 492 (Tex. Crim. App. 1999). We must consider: "(1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record." *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).

In *Stuhler v. State*, the Court of Criminal Appeals held that the defendant suffered *egregious* harm[12] from a jury charge that allowed for a non-unanimous verdict on the issue of whether a child suffered serious bodily injury or serious mental injury. *See* 218 S.W.3d at 719–20. Although neither the trial court nor the State stressed to the jury that it need not agree about which of the elemental facts occurred, the State did argue to the jury that the evidence would support a verdict based on either bodily or mental injury. *Id.* at 719. Because the charge itself did not require unanimity as to the type of injury, the jury "could readily have convicted the appellant without even substantively debating which of the two types of injury she caused." *Id.* Finally, the court reasoned that the State's discussion of evidence of both bodily and mental injury during closing argument "increased the

---

[12] The egregious harm standard is "a high and difficult standard"; in contrast, the some harm standard applied here is a "less-stringent standard." *Reeves*, 420 S.W.3d at 816.

22

already substantial risk that the jury would not find it necessary to agree as to which type of injury the appellant inflicted." *Id.* at 720.

Similarly, in *Ngo v. State*, the Court of Criminal Appeals held that the defendant suffered *egregious* harm when the State and trial court "misstated the law at the very beginning of the case and at the very end" by telling the jury that it need not unanimously agree about whether the defendant stole a credit card, received a stolen credit card, or presented the credit card with the intent to obtain a benefit fraudulently. 175 S.W.3d at 744, 751–52. "Furthermore, the evidence was contested as appellant testified and denied committing any one of the three offenses." *Id.* at 751. The court noted that the jury charge error was not corrected or ameliorated in another portion of the charge, and it was compounded by a misleading statement concerning unanimity that was actually in the charge. *Id.* at 752.[13] Based on the erroneous charge as a whole, the state of the evidence, and the affirmative statements of the trial judge and State that the jury could return a non-unanimous verdict, the court was unable to "determine that the jury was, in fact, unanimous in finding appellant guilty of one specific credit-card-abuse offense." *Id.* at 752.

Here, the State told the jurors at the very beginning of the case, during voir dire, that the jurors need not unanimously agree about who owned the property that appellant stole:

---

[13] This misleading statement was the "boilerplate" section of the charge dealing with the selection of a jury foreman. It informed the jurors that the foreman would certify the jury's verdict "when you have unanimously agreed upon a verdict." *Ngo*, 175 S.W.3d at 745. The court reasoned that "this unanimity instruction is worse than saying nothing because it affirmatively supports the prosecutor's erroneous jury argument that the jurors need agree only on their ultimate general 'verdict' of guilty, rather than specifying that they need to unanimously agree on any one of the three specific criminal acts set out in the jury charge." *Id.*

23

You can go back there as jurors and let's say Juror No. 3 believes that $200,000 was stolen from Barbara Allen, or over $200,000 was stolen from Barbara Allen, and Juror 4 believes over $200,000 was stolen from JoAnn Aniol and Larry Aniol. And they don't have to agree on that. They have to agree that the total amount of over $200,000 was stolen from one of the complainants or a combination of the complainants.

When the State asked the venire whether they agreed with that proposition, multiple venire members agreed, including Juror No. 3, who ultimately was chosen for the jury. The State's incorrect statement of the law weighs in favor of finding some harm. *See Jourdan*, 428 S.W.3d at 98 (State's erroneous unanimity argument "is obviously an important consideration in any analysis of egregious harm").

This misstatement of the law was never corrected. Although defense counsel during closing argument encouraged the jurors to "go through these 20 transactions" and ask themselves whether the State proved "each and every one" beyond a reasonable doubt, neither party informed the jurors that they needed to unanimously agree about who owned the property. *See Ngo*, 175 S.W.3d at 751–52 (uncorrected erroneous unanimity argument contributed to egregious harm).

Regarding the state of the evidence, the State contends on appeal that appellant did not suffer any harm because "appellant's evidence did not challenge the verity of the individual transactions but rather the nature of the entire relationship," and "there was no meaningful argument that some of the transactions were substantially different from the others." We disagree.

Unlike the transactions involving the Allens, the Aniols were more careful about documenting their agreement with appellant that any money would be held in escrow. As discussed above, the State introduced multiple documents signed by appellant acknowledging that the Aniols' money would be held in escrow and

24

returned. The State introduced no such clear documentation pertaining to the Allens. Although one of the 2003 loan commitment letters for the Allens references the $200,000 buy-down payment and states it "will be refunded to the borrow in its entirety," the State and witnesses at trial treated this initial $200,000 as belonging to the Aniols. This $200,000 was the subject of a separate "personal loan" agreement between the Aniols and Barbara. Thus, there was conflicting evidence about who owned this money—the Aniols or the Allens.[14]

During closing argument, the State acknowledged the differences in the transactions involving the Aniols and the Allens, particularly based on appellant's assertion that the Aniols and Allens executed a "general release":

> They also talked about a general release. And if for some reason you thought that document, Defense Exhibit No. 2, should wipe away any criminal responsibility regarding the $975,000 that the Aniols loaned, Defense Exhibit 1 sure doesn't. Because this document was executed by Barbara Allen, a loan [sic] on December 8th, 2005. And you know after that date she gave, along with her daughter, over $200,000 to Kevin Kent for nothing.

So, the State acknowledged that the jurors had before them different considerations involving the Aniols' transactions and the Allens' transactions. Given that the State argued for a conviction based on the "hotel" transaction with the Allens but the escrow documentation was stronger for the Aniols, the risk of non-unanimity was exacerbated. The State told the jurors further that they could conclude $200,000 had been stolen from each set of owners: "He is guilty of stealing over $200,000 from each of these people individually." Accordingly, some of the jurors could have concluded that appellant stole over $200,000 from the Aniols, while

---

[14] Similarly, $125,000 was transferred from the Aniols to Barbara under a promissory note, and then Barbara transferred it to appellant. But the Aniols included this payment as part of the $975,000 Joann testified that appellant stole from the Aniols.

others could have concluded that he stole over $200,000 from the Allens, despite his primary defensive posture that he earned all of the money.

Further, the State contends that the balance of the jury charge was correct, noting that the jury was "instructed to certify their verdict only after they 'have unanimously agreed upon a verdict.'" However, this boilerplate language, located in the part of the charge addressing selection of a jury foreman, did not ameliorate the harm. In fact, it compounded the harm from the State's argument that the juror's need not unanimously agree about from whom appellant stole over $200,000. *See Ngo*, 175 S.W.3d at 745, 752.

Finally, we note that the danger of harm is especially present in this case because the lack of unanimity concerned underlying discrete offenses that are component parts of an aggregated offense. As in *Richardson*, there is an increased "likelihood that treating violations simply as alternative means, by permitting a jury to avoid discussion of the specific factual details of each violation, will cover up wide disagreement among the jurors about just what the defendant did, or did not, do." *Richardson*, 526 U.S. at 819. Although present at least to some degree whenever multiple means are at issue, there is a significant risk "that jurors, unless required to focus upon specific factual detail, will fail to do so, simply concluding from testimony, say, of bad reputation, that where there is smoke there must be fire." *Id.* Indeed, there was evidence of appellant's other bad conduct in this case, as the State introduced extraneous offense evidence of his alleged thefts from other victims after the transactions involving the Aniols and Allens.

After reviewing the entire record, including the jury charge, the contested issues and evidence, and the arguments of counsel, we "cannot determine that the jury was, in fact, unanimous in finding" the elements of aggravated theft. *See Ngo*, 175 S.W.3d at 752. The evidence was contested, the State told the jury that

unanimity was not required, the State urged for a conviction based on evidence of different underlying thefts (i.e., different elements of aggregate theft), and the jury charge's boilerplate language compounded the harm. *See Stuhler*, 218 S.W.3d at 719–20; *Ngo*, 175 S.W.3d at 751–52. The jury might well have reached a non-unanimous verdict concerning the gravamina of the underlying thefts—in particular, from whom appellant stole over $200,000. Appellant suffered some actual, rather than theoretical, harm.

## IV. CONCLUSION

Having sustained appellant's sole issue on appeal, we reverse the trial court's judgment and remand for a new trial.


/s/     Sharon McCally
        Justice

Panel consists of Justices Christopher, Jamison, and McCally.

Publish — Tex. R. App. P. 47.2(b).